## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Shamso M. K.,                                      Case No. 19-cv-1531 (TNL)

         Plaintiff,

v.                                                        **ORDER**

Andrew Saul,
Commissioner of Social Security,

         Defendant.

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 890, Minneapolis, MN 55401; and Karl E. Osterhout, Osterhout Berger Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA 15139 (for Plaintiff); and

James Sides, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 340, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Shamso M. K. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment. ECF Nos. 13, 19. For the reasons set forth below, Plaintiff's motion is denied and the Commissioner's motion is granted.

1

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in 2015, asserting that she has been disabled since December 31, 2010, due to kidney failure, rheumatoid arthritis, acid reflux, "[s]troke in 2012," and high blood pressure.[1]  Tr. 44; *see also* Tr. 10, 55.  Plaintiff's application was denied initially and again upon reconsideration.  Tr. 10, 51-52, 61, 63.  Plaintiff appealed the reconsideration of the DIB determination by requesting a hearing before an administrative law judge ("ALJ").  Tr. 10, 78.  Prior to the hearing, Plaintiff submitted approximately 800 pages of kidney-treatment records dating back to 2011.  Tr. 10; *see* Tr. 677-1477.  *See, e.g.*, 20 C.F.R. §§ 404.935 (submitting written evidence to ALJ), .1512(a) (claimant's responsibility to submit evidence).

The ALJ held a hearing on June 20, 2018.  Tr. 10, 26, 28.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review.  Tr. 1-5, 246; *see* Tr. 146-48.  Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 13, 19.  This matter is now fully briefed and ready for a determination on the papers.

## III. ANALYSIS

### A.  Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he

---

[1] Plaintiff also applied for supplemental security income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, at the same time.  Pl.'s Mem. in Supp. at 1 & n.1, ECF No. 14.  This application was granted and she has been receiving SSI benefits.  *See* Tr. 15, 30; Pl.'s Mem. in Supp. at 1 n.1.

threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual

unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

**B. Nature of DIB**

In order to be entitled to DIB, Plaintiff must establish that she was disabled before her insurance expired. *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) (citing *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). "[T]he date of last insurance is the last date an individual is eligible to receive DIB in view of her earnings record. Thus, the claimant must establish disability on or before that date in order to be entitled to DIB." *Michelle P. v. Berryhill*, No. 17-cv-4286 (HB), 2019 WL 1318352, at *1 n.4 (D. Minn. Mar. 22, 2019), *aff'd*, 798 F. App'x 44 (8th Cir. 2020). Plaintiff was last insured on June 30, 2011. *See, e.g.*, Tr. 12; Pl.'s Mem. in Supp. at 2 n.2; Comm'r's Mem. in Supp. at 1, ECF No. 20. Thus, Plaintiff must prove that she was disabled before June 30, 2011.

4

### C.  ALJ's Decision

The ALJ reviewed and admitted the approximately 800 pages of kidney-treatment records, noting "the need for records required to meet the remote onset date and [date last insured]."  Tr. 10.  The ALJ found that Plaintiff had the severe impairments of rheumatoid arthritis, chronic kidney disease with microscopic hematuria, "normal diagnosed as history of [n]ephrotic syndrome"; and anemia secondary to kidney disease.  Tr. 13.  The ALJ determined that none of these impairments when considered individually or in combination met or equaled a listed impairment, specifically considering, among other listings, Listings 6.03 (chronic kidney disease) and 7.18 (repeated complications of hematological disorders, including anemia).  The ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work with additional limitations as follows:

> lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; sitting for 6 hours, standing for 2 hours, and walking for 2 hours; push/pull as much as can lift/carry. [Plaintiff] can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally.  [Plaintiff] can never work at unprotected heights, never with moving mechanical parts, never operating a motor vehicle, and never in humidity and wetness.  NO USE OF HAND POWER TOOLS OR DIRECT CONTACT WITH HEAVY VIBRATING MACHINERY.

Tr. 14.  In reaching this residual-functional-capacity determination, the ALJ gave "great weight" to the opinions of the state agency medical consultants.  Tr. 16.

### D.  Duty to Develop the Record

The thrust of Plaintiff's argument is that the ALJ failed to fully develop the record in her case.  "[S]ocial [S]ecurity hearings are non-adversarial."  *Snead v. Barnhart*, 360

F.3d 834, 838 (8th Cir. 2004). "Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case." *Id.*; *see, e.g.*, *Combs v. Berryhill*, 787 F.3d 642, 646 (8th Cir. 2017); *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). "Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on [her] ability to work." *Byes v. Astrue*, 687 F.3d 913, 916 (8th Cir. 2012).

An ALJ does not, however, "fail in his [or her] duty to develop the record if substantial evidence exists to allow the ALJ to make an informed decision." *Hey v. Colvin*, 136 F. Supp. 3d 1021, 1046 (D. Minn. 2015) "A [claimant] seeking to reverse an ALJ's decision due to the failure to adequately develop the record bears a heavy burden: a [claimant] must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." *Id.*; *see Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). "There is no bright line rule indicating when the [ALJ] has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008); *accord Smith v. Astrue*, 232 F. App'x 617, 619 (8th Cir. 2007). And, in the end, "the burden of persuasion to prove disability and demonstrate [residual functional capacity] remains on the claimant." *Vossen*, 612 F.3d at 1016; *accord Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Plaintiff argues that, although the ALJ reviewed and admitted the additional kidney-treatment records, the ALJ did not obtain review of the *entire* medical record—i.e., inclusive of those 800 pages—by a medical expert "or return the significantly updated case

record to the State Agency for a new review of the new evidence by one of its medical consultants."  Pl.'s Mem. in Supp. at 3.  Plaintiff argues that this failure to develop the record affected the ALJ's determination of whether her severe impairments met or equaled a listed impairment and the reasonableness of the ALJ's reliance on the opinions of the state agency medical consultants in concluding that she was not disabled.

### 1.  Meets or Equals a Listed Impairment

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing.  'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'"  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

"An impairment meets a listing only if it 'meet[s] all of the specified medical criteria.'"  *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (alteration in original) (quoting *Sullivan*, 493 U.S. at 530).  "An impairment is medically equivalent under the regulations if it is 'at least equal in severity and duration to the criteria of any listed impairment.'"  *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)); *accord* 20 C.F.R. § 404.1526(a).  "To establish equivalency, a claimant 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'"

7

*Carlson*, 604 F.3d at 594 (quoting *Sullivan*, 493 U.S. at 531). "The claimant has the burden of proving that h[er] impairment meets or equals a listing." *Id.* at 593.

### a. Listing 6.03

Listing 6.03 addresses chronic kidney disease accompanied by dialysis treatment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 6.03 (chronic kidney disease "with chronic hemodialysis or peritoneal dialysis"); *see id.* § 6.00.C.1 (discussing dialysis treatment). "Under [Listing] 6.03, [a claimant's] ongoing dialysis must have lasted or be expected to last for a continuous period of at least 12 months." *Id.* § 6.00.C.1.a. A report from an acceptable medical source describing the claimant's chronic kidney disease, current dialysis, and need for ongoing dialysis is sufficient. *Id.* ("To satisfy the requirements in 6.03, we will accept a report from an acceptable medical source that describes your [chronic kidney disease] and your current dialysis, and indicates that your dialysis will be ongoing."). Significantly, the regulations provide that a claimant whose chronic kidney disease requires dialysis may "meet [the] definition of disability *before* [the claimant] started dialysis." *Id.* § 6.00.C.1.b (emphasis added). Accordingly, "the onset of . . . disability [is] based on the facts in [the] case record." *Id.*

### i.

In early January 2011, Plaintiff was diagnosed with microscopic hematuria.[2] Tr. 594; *see also, e.g.*, Tr. 603, 606. She had an "[u]nremarkable renal and bladder

---

[2] "Hematuria is the presence of blood in a person's urine." *Hematuria (Blood in Urine)*, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, U.S. Dep't of Health & Human Servs., https://www.niddk.nih.gov/health-information/urologic-diseases/hematuria-blood-urine (last accessed Sept. 21, 2020). Microscopic hematuria occurs "when a person cannot see the blood in his or her urine, yet it is seen under a microscope." *Id.*

ultrasound." Tr. 595. In September 2011, approximately two months after her date last insured, Plaintiff was seen in the emergency room and "noted to have abnormal kidney function." Tr. 251.

Plaintiff sought emergency care again approximately one month later in mid-October "complaining of hematuria and lower extremity swelling." Tr. 251. Plaintiff's "[l]abs [were] notable for renal insufficiency (chronic)." Tr. 256; *see* Tr. 260 ("She had some labs which showed that she was in renal failure and was told that she needed a kidney biopsy to ascertain the cause of this renal failure."). Among other things, Plaintiff was diagnosed with nephrotic syndrome, renal insufficiency, and "[i]ron deficiency anemia" secondary to her renal dysfunction. Tr. 263; *see also* Tr. 261. It was recommended that Plaintiff undergo a renal biopsy, which she declined. Tr. 256. Plaintiff was ultimately admitted to the hospital. *See* Tr. 256, 264.

Plaintiff had a nephrology consultation the following day. Tr. 263-67. Nephrology confirmed the diagnoses of acute renal failure, nephrotic syndrome, and anemia. Tr. 265-66. It was noted that Plaintiff's "February 19, 2011 serum creatinine level [was] 0.67. Now the serum creatinine is 1.68 with eGFR 43%." Tr. 265. It was again recommended that Plaintiff undergo a diagnostic kidney biopsy, which she again declined. "There [we]re no uremic symptoms and no need for dialysis at present." Tr. 265.

Plaintiff subsequently began dialysis treatment at the end of November due to "worsening renal failure and symptoms of uremia." Tr. 269 (noting dialysis started on 11/29/11); *see* Tr. 629 (noting worsening lab results); *see also* Tr. 292 (noting dialysis started on 11/30/11); 969 (listing 11/30/11 as "Date of 1st Chronic Treatment"). Plaintiff

receives hemodialysis treatment three times per week. *See* Tr. 273 (instructions to follow up with outpatient dialysis treatment); Tr. 574, 631-32, 635, 637, 639, 641, 651, 654, 663, 668 (noting thrice weekly dialysis treatment); *see generally* Tr. 677-1477; *see also* Tr. 576 (2015 treatment note stating "Dialysis was started 3 years ago"), 661 (2014 treatment note stating "Dialysis last two years"). In or around May 2012, Plaintiff's nephrologist encouraged her to place her name on the transplant list. *See, e.g.*, Tr. 639. Plaintiff's primary care provider was also "very blunt with [Plaintiff]," telling her that "[s]he is going to need chronic dialysis" and should put her name on the transplant list. Tr. 640. In January 2013, Plaintiff's primary care provider noted that she had placed her name on the transplant list. Tr. 651-52.

### ii.

Addressing whether Plaintiff's severe impairments met or equaled Listing 6.03, the ALJ noted that the medical evidence showed Plaintiff had "chronic kidney disease with microscopic hematuria" and a "history of [n]ephrotic syndrome and anemia secondary to kidney disease" as of her date last insured. Tr. 15. The ALJ also noted that Plaintiff "was diagnosed with [e]nd [s]tage [r]enal [d]isease and commenced dialysis sometime between November and December 2011" and that "[s]he is currently on dialysis and is on the transplant list." Tr. 15. The ALJ concluded, however, that "the record does not endorse listing-level deterioration of [Plaintiff's] condition until the fall of 2011, and there is no basis to extrapolate back those conditions to the June 30, 2011 [date last insured]." Tr. 13. The ALJ further concluded that, "[a]lthough in her current condition, [Plaintiff] meets

Listing 6.03, kidney disease with chronic hemodialysis, the was not the case prior to [Plaintiff's date] last insured."  Tr. 15.

### iii.

Acknowledging that she began dialysis after her date last insured, Plaintiff argues that the state agency medical consultants were not aware that she had begun dialysis treatment.  Pl.'s Mem. in Supp. at 8 ("Critically, the Agency's nonexamining reviewers were not aware of this fact at the time of their reviews.").  Plaintiff argues that, because the state agency medical consultants did not have access to the additional kidney-treatment records, "the ALJ erred in failing to call a medical expert to determine whether [her] chronic kidney disease and need for dialysis starting in the fall of 2011 met the definition of disability prior to her starting dialysis (i.e., a 'retroactive inference' was necessary)."  Pl.'s Mem. in Supp. at 10.

Plaintiff bases her arguments on Social Security Ruling ("SSR") 83-20 and *Grebenick v. Chater*, 121 F.3d 1193 (8th Cir. 1997), essentially arguing that the ALJ improperly inferred the onset date of disability without the aid of a medical expert.  SSR 83-20 recognizes that, "[w]ith slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment becomes disabling."  Social Security Ruling 83-20, *Titles II and XVI: Onset of Disability*, 1983 WL 31249, at *2 (Soc. Sec. Admin. Jan. 1, 1983) [hereinafter SSR 83-20].  This is particularly true "when, for example, the alleged onset date and the date last worked are far in the past and adequate medical records are not available.  In such cases, it will be necessary to infer the onset date from the medical and other evidence that describes the history and

11

symptomatology of the disease process." *Id.*; *see also id.* at *3 ("In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.").

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the [ALJ] should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> . . .
>
> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

*Id.*

In *Grebenick*, the Eighth Circuit Court of Appeals explained that "the issue of whether a medial advisor is required under SSR 83-20 does not turn on whether the ALJ could reasonably have determined that [the claimant] was not disabled before [her date last insured]," but "whether the evidence is ambiguous regarding the possibility that the onset of her disability occurred before the expiration of her insured status." 121 F.3d at 1200-01. "If the medical evidence is ambiguous and a retroactive inference is necessary, SSR

83-20 requires the ALJ to call upon the services of a medical advisor to insure that the documentation of onset is based upon a 'legitimate medical basis.'" *Id.* at 1201 (quoting SSR 83-20, 1983 WL 31249, at *3).

Plaintiff contends that the state agency medical consultants "were not aware of [her] dialysis, or for that matter, much of the evidence related to the period in and around her date last insured," and thus "never considered whether her need for dialysis met the definition of disability before she started undergoing dialysis." Pl.'s Mem. in Supp. at 8. Plaintiff's premise, however, is contradicted by the record. As the Commissioner points out, the record before the state agency medical consultants *did* "document[] Plaintiff's three-times-a-week dialysis [treatment] starting in November 2011." Comm'r's Mem. in Supp. at 10; *see, e.g.*, Tr. 269, 273, 292, 574, 576, 631-32, 635, 637, 639, 641, 651, 654, 663, 661, 969.

Similarly, Plaintiff argues that the record before the state agency medical consultants was "vastly underdeveloped" and "patently incomplete." Pl.'s Mem. in Supp. at 4. But, other than the incorrect assertion that the fact of her dialysis treatment was not previously part of the record, Plaintiff has not articulated what evidence in the additional kidney-treatment records creates ambiguity as to the possibility that her chronic kidney disease met Listing 6.03 on or before her date last insured. *See Grebenick*, 121 F.3d at 1201 (need for medical advisor was "obviate[d]" when "medical evidence . . . was unambiguous"); *see, e.g.*, *Schmick v. Astrue*, No. 1:07CV69 HEA, 2008 WL 4402204, at *16 (E.D. Mo. Sept. 24, 2008) (ALJ not required to obtain a medical expert where evidence was not ambiguous); *see also Lewis v. Colvin*, No. 1:13-cv-3445 DCN, 2014 WL 6908900,

at \*13 (D. S.C. Dec. 8, 2014) (ALJ did not err in failing to call medical expert to testify where record "contained sufficient evidence so that an onset date d[id] not have to be inferred").  Considering the repeated references to Plaintiff's dialysis treatment already present in the record, Plaintiff has not shown that there was a failure to develop necessary evidence.  Further, in light of these existing references and absent an explanation as to the particular significance the additional kidney-treatment records had on the determination of whether her chronic kidney disease met or equaled Listing 6.03, Plaintiff has not shown that the mere fact that these records were not before the state agency consultants was unfair or prejudicial.

In the end, it is Plaintiff's burden to prove that her chronic kidney disease met or equaled Listing 6.03 prior to her date last insured.  While there certainly may be cases in which the commencement of dialysis treatment five months after the date last insured combined with other evidence in the record creates ambiguity as to whether a claimant's chronic kidney disease meets or equals Listing 6.03 as of the date last insured, Plaintiff has not shown that to be the case here.  The ALJ did not fail to develop the record with respect to Plaintiff's chronic kidney disease and was not required to obtain further expert review following the submission of the additional kidney-treatment records.

### b.  Listing 7.18

Plaintiff similarly argues that the ALJ erred in failing to develop further the record with respect to whether her anemia met or equaled Listing 7.18, repeated complications of hematological disorders.  Hematological disorders are "disorders of the blood and blood-forming organs."  *Hematologic Diseases*, Nat'l Inst. of Diabetes & Digestive & Kidney

14

Diseases, U.S. Dep't of Health & Human Servs., https://www.niddk.nih.gov/about-niddk/research-areas/hematologic-diseases (last accessed Sept. 21, 2020) (listing anemia as a hematologic disease).

> Anemia is a condition in which the body has fewer red blood cells than normal.  Red blood cells carry oxygen to tissues and organs throughout the body and enable them to use energy from food.  With anemia, red blood cells carry less oxygen to tissues and organs—particularly the heart and brain—and those tissues and organs may not function as well as they should.

Anemia in Chronic Kidney Disease, Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, U.S. Dep't of Health & Human Servs., https://www.niddk.nih.gov/health-information/kidney-disease/anemia (last accessed Sept. 21, 2020).  Anemia is common in individuals with chronic kidney disease.  *Id.*; *see, e.g.*, *Lewis*, 2014 WL 6908900, at *12 ("Anemia is one of many possible combinations of chronic kidney disease.").

Listing 7.18 addresses repeated complications of a hematological disorder of the type listed in certain other hematological-disorder listings but which do not otherwise satisfy those listings' criteria "or other complications . . . , resulting in significant, documented symptoms or signs (for example, pain, severe fatigue, malaise, fever, night sweats, headaches, joint or muscle swelling, or shortness of breath)," causing a marked limitation in activities of daily living, social functioning, or the "complet[ion of] tasks in a timely manner due to deficiencies in concentration, persistence, or pace."  20 C.F.R. pt. 404, subpt. P, app. 1, § 7.18.

The regulations define "repeated complications" as complications that

> occur on an average of three times a year, or once every 4
> months, each lasting 2 weeks or more; or the complications do
> not last for 2 weeks but occur substantially more frequently
> than three times in a year or once every 4 months; or they occur
> less frequently than an average of three times a year or once
> every 4 months but last substantially longer than 2 weeks.

*Id.* § 7.00.G.2.  A claimant can satisfy Listing 7.18 "regardless of whether [she has] the

same kind of complication repeatedly, all different complications," or a combination

thereof.  *Id.*  Such complications, however, must occur at the specified "frequency and

duration" and within the period being considered in connection with the claimant's

application.  *Id.*

Additionally, to meet or equal Listing 7.18, a claimant's "hematological disorder

must result in a 'marked' level of limitation" in activities of daily living, social functioning,

or the "complet[ion] of tasks due to deficiencies in concentration, persistence, or pace."

*Id.* § 7.00.G.3.

> Functional limitations may result from the impact of the
> disease process itself on [the claimant's] mental functioning,
> physical functioning, or both . . . . This limitation could result
> from persistent or intermittent symptoms, such as pain, severe
> fatigue, or malaise, resulting in a limitation of [the claimant's]
> ability to do a task, to concentrate, to persevere at a task, or to
> perform the task at an acceptable rate of speed.

*Id.*  Functional limitations might also result from "treatment and its side effects."  *Id.*  A

"marked limitation" occurs when "the symptoms and signs of [a claimant's] hematological

disorder interfere seriously with [her] ability to function."  *Id.* § 7.00.G.4.  A "marked

limitations" is not defined "by a specific number of different activities of daily living or

different behaviors in which [the claimant's] social functioning is impaired, or a specific

number of tasks that [she is] able to complete, but by the nature and overall degree of interference with [her] functioning." *Id.* A claimant "may have a marked limitation when several activities or functions are impaired, or even when only one is impaired." *Id.* A marked limitation "does not imply that [a claimant] must be confined to bed, hospitalized, or in a nursing home," and a claimant "need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation interferes seriously with [her] ability to function independently, appropriately, and effectively." *Id.*

Plaintiff argues that she suffered complications from her anemia in the form of a rheumatoid arthritis flare with hospitalization in May 2011, a need for physical therapy in July 2011, and an inability to schedule the recommended biopsy due to multiple illnesses, and that these complications resulted in marked limitation of her activities of daily living.

### i.

Plaintiff has a history of rheumatoid arthritis since at least 2009. *See, e.g.*, Tr. 567, 602-03, 606; *see also* Tr. 34, 576, 583-84, 587, 593. At the hearing, Plaintiff testified that she was unable to cook, clean, or walk on account of her rheumatoid arthritis. Tr. 35. Plaintiff testified that a personal care attendant ("PCA") helped her with bathing, grooming, cleaning, cooking, and obtaining her prescriptions. Tr. 35-36. Plaintiff currently lives with her adult daughter and continues to have PCA services four hours per day. Tr. 36.

In or around February 2011, Plaintiff was diagnosed with "[u]nspecified [i]ron [d]eficiency [a]nemia." Tr. 611; *see also* Tr. 261, 263, 266; *cf.* Tr. 30-31. In early July 2011, just after her date last insured, Plaintiff began a course of pool therapy to address the

pain and stiffness associated with her rheumatoid arthritis.  Tr. 507-08; *see generally* Tr. 507-39.  During the initial assessment, Plaintiff reported decreased range of motion and pain in her joints as well as swelling.  Tr. 508.  It was also noted that Plaintiff was "[u]nable to sit to stand without assist[ance]"; had "[i]ncreased pain with prolonged sitting or standing"; and was "unable to dress or bathe independently."  Tr. 508.

Plaintiff participated in pool therapy through the end of September.  *See generally* Tr. 507-39.  Plaintiff reported improvement with pool therapy.  Tr. 523, 529, 535.  While Plaintiff initially rated her pain at a 5, meaning moderate pain, her pain overall decreased to 0 or 2 around the middle and up to the end of September.  *Compare* Tr. 508, 514, 517, 520, 523 *with* Tr. 526, 529, 532, 535.  *But see* Tr. 537.

Plaintiff was subsequently seen for complaints of nausea, vomiting, diarrhea, and abdominal pain at the end of November 2011.  Tr. 885.  During this appointment, Plaintiff reported that although a renal biopsy had been recommended, "she ha[d] been unable to schedule this due to multiple illnesses."  Tr. 885.  It was also noted that Plaintiff "had a rheumatoid arthritis flare in 05/2011 for which she was admitted to Regions Hospital."  Tr. 885.

### ii.

With respect to Listing 7.18, the ALJ noted that "the listing requires the complications [to] occur three times per year, lasting 2 weeks or more."  Tr. 13.  The ALJ concluded that Plaintiff did not have the marked limitation in functioning required under Listing 7.18 during the relevant period and it was not "until the terrible worsening of [her]

18

condition in October 2011 resulting in dialysis and the need for a wheelchair" that she

experienced a marked limitation in functioning.  Tr. 13-14.  The ALJ reasoned:

> There are no objective endorsements of marked deficits in
> social functioning or pace.  [Plaintiff] did testify to the need for
> a PCA . . . when she relocated from Ohio to Minnesota in 2008.
> She moved here with her 11-year[-]old daughter, who is no[w]
> 21.   She has lived alone with that daughter, who is now
> attending college.  It is not clear, however, precisely what the
> PCA does and how the PCA services are necessitated by
> [Plaintiff's] medical condition.  As noted above, [Plaintiff was]
> ambulatory until the worsening of her condition in October
> 2011.  She had a flare of rheumatoid arthritis in June 2011,
> which was noted to cause trouble with her rising from a seated
> position.  However, that condition resolved before the final and
> dramatic worsening of [Plaintiff's] condition in October.

Tr. 14.

### iii.

Plaintiff argues that the ALJ should have obtained testimony from a medical expert

on whether her anemia met or equaled Listing 7.18 because the May 2011 hospital stay in

connection with her rheumatoid arthritis and the notation that she had been unable to

schedule the renal biopsy due to multiple illnesses were in the additional kidney-treatment

records that had not been reviewed by the state agency medical consultants.   Plaintiff

argues that "a review of the entire record by a medical expert was needed to determine if

this Listing was met or equaled."  Pl.'s Mem. in Supp. at 11.

As stated above, an impairment will meet or equal a listed impairment only if it

meets or equals *all* of the listing's specified criteria.  *McCoy*, 648 F.3d at 611-12; *see KKC*,

818 F.3d at 370; *Carlson*, 604 F.3d at 594.  Even assuming for sake of argument that

Plaintiff's anemia caused repeated complications occurring at the frequency and duration

specified in Listing 7.18, Plaintiff must still show that her anemia caused a marked limitation in one of the three areas of functioning.   20 C.F.R. pt. 404, subpt. P, app. 1, § 7.18; *see id.* §§ 7.00.G.3, .4.   The ALJ concluded that Plaintiff did not have a marked limitation in any of the three areas of functioning until the worsening of her condition in October 2011, after her date last insured.   Plaintiff notes that her agency-level representative argued that she had marked limitation in her activities of daily living based on the physical therapy notes.   Yet, Plaintiff has not asserted that the ALJ erred in concluding that she did not have marked limitation in her activities of daily living or otherwise challenged the ALJ's conclusion with respect to the impact her hematological disorder had on her functioning.   The Court will not develop arguments for her.   *See Laveau v. Astrue*, No. 11-cv-505 (SRN/LIB), 2012 WL 983598, at *12 n.6 (D. Minn. Feb. 14, 2012), *report and recommendation adopted*, 2012 WL 983630 (D. Minn. Mar. 22, 2012).

"Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment."   *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013).   "Past this point, an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision."   *Id.* (quotation omitted); *see also Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) ("An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.") (quotation omitted); *McCoy*, 648 F.3d at 612 ("The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant

is disabled.").  As such, "[w]hile an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy*, 648 F.3d at 612.  Having failed to meet her burden to show that her anemia met or equaled Listing 7.18 as of her date last insured, Plaintiff's contention that the ALJ did not fully develop the record with respect to this listing is unavailing.

### 2.  Residual Functional Capacity & Reliance on State Agency Medical Consultants

Lastly, Plaintiff argues that the ALJ unreasonably relied on the "underinformed" opinions of the state agency medical consultants in determining her residual functional capacity because they did not have the additional kidney-treatment records.  Pl.'s Mem. in Supp. at 4.

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1); *see McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence.").  "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  "Medical records, physician observations, and the claimant's subjective statements about [her] capabilities may be used to support the [residual functional capacity]." *Perks*, 687 F.3d at 1092.  There is, however, "no requirement that [a residual-functional-capacity] finding be supported by a specific

medical opinion." *Hensley*, 829 F.3d at 932; *accord Twyford v. Comm'r*, 929 F.3d 512, 518 (8th Cir. 2019) ("We do not require that every aspect of [a residual-functional-capacity] finding be supported by a specific medical opinion, only that it be supported by some medical evidence of the claimant's ability to function in the workplace.") (quotation omitted).

"Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016); *see also, e.g.*, *Vossen*, 612 F.3d at 1016; *Stormo*, 377 F.3d at 806.

Noting the ALJ found additional severe impairments beyond those identified at the initial and reconsideration levels, Plaintiff argues that "no *physician* considered whether the combination of [her severe] impairments resulted in greater limitations than found by [the state agency medical consultants], who limited her to sedentary . . . work with occasional postural and a few environmental limitations based solely on the severe impairment of chronic kidney disease." Pl.'s Mem. in Supp. at 7. According to Plaintiff, the ALJ's decision amounts to "lay analysis of the raw medical data," and "[a] review of the entire record by a medical expert [i]s needed to further assess [her residual functional capacity]" in light of the four severe impairments found by the ALJ. Pl.'s Mem. in Supp.

at 4, 7-8. Without such review, Plaintiff argues "it cannot be said what additional limitations would have been assessed." Pl.'s Mem. in Supp. at 12.

Plaintiff gives two examples in support of her argument that the ALJ unreasonably relied on the opinions of the state agency medical consultants rendered without the benefit of the additional kidney-treatment records. First, Plaintiff asserts that, if she were limited to less than frequent use of her hands on account of her rheumatoid arthritis, certain jobs identified by the vocational expert would no longer be available. Plaintiff cites to medical records documenting complaints of joint pain and stiffness, the physical therapy notes from July 2011, and the reference to a hospital stay in May 2011. But, other than the reference to the hospital stay, all of this information was in the record before the state agency medical consultants. Second, Plaintiff asserts that the symptoms she experienced could impact her ability to work on a regular and continuing basis, citing to medical records documenting complaints of vomiting, abdominal pain, and weakness as well as weight loss between January and October 2011. But, again, all of this information was in the record before the state agency medical consultants.

Significantly, the ALJ did not rely solely on the opinions of the state agency medical consultants in concluding that Plaintiff was capable of performing a limited range of sedentary work through her date last insured. The ALJ also conducted an independent review of the medical evidence, including the additional kidney-treatment records, and considered Plaintiff's statements regarding her ability to function. *See, e.g.*, *Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); *see also Thiele v. Astrue*, 856 F. Supp. 2d 1034, 1047 (D. Minn. 2012)

("However, if the ALJ did not rely solely on the nonexamining physician's opinion but also conducted an independent review of the medical evidence and other evidence, such as motivation to return to work and daily activities, then there is substantial evidence in the record to support the ALJ's [residual-functional-capacity] determination."). In concluding that Plaintiff was capable of performing a limited range of sedentary work, the ALJ noted that Plaintiff's "course of treatment prior to the date last insured was mainly for acute illness" and most of the treatment notes in the record were after the date last insured. Tr. 16. The ALJ acknowledged that Plaintiff had been diagnosed with rheumatoid arthritis and attended physical therapy around the date she was last insured, but also pointed out that she was subsequently discharged from physical therapy and later noted to be ambulatory. Tr. 16. The ALJ further noted that Plaintiff's "function report completed in 2016 reflects very minimal activities but this appears to describe her current functioning and not her functioning prior to the date last insured." Tr. 16. After considering all of the evidence in the record, including the opinions of the state agency medical consultants and the additional kidney-treatment records, the ALJ found that Plaintiff's "physical exams are consistent with a sedentary exertional level with additional limitations" and she "did not worsen to listing level or to an inability to sustain full-time work until her dramatic downturn in October 2011." Tr. 16.

Finally, Plaintiff has not specifically articulated what additional functional limitations should have been included by the ALJ. *See Stormo*, 377 F.3d at 807 ("It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability.") (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146

(1987)); *see also, e.g.*, *Kim J. H. v. Saul*, No. 18-cv-2736 (MJD/TNL), 2020 WL 872308, at *7 (D. Minn. Jan. 28, 2020), *report and recommendation adopted*, 2020 WL 869963 (D. Minn. Feb. 21, 2020).  Plaintiff has done little more than speculate that it might be possible to reach a different conclusion regarding her residual functional capacity based on the evidence in the record.  The same thing could be said in nearly every case.  *See Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) ("We may not reverse simply because we would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion."); *Perks*, 687 F.3d at 1091; *cf. Chaney*, 812 F.3d at 676.

In sum, the ALJ did not unreasonably rely on the opinions of the state agency medical consultants as one piece of evidence to conclude Plaintiff was capable of performing a limited range of sedentary work up through her date last insured.

## IV. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 13, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 19, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September__28__, 2020                     _____*s/ Tony N. Leung*_____
                                                 Tony N. Leung
                                                 United States Magistrate Judge
                                                 District of Minnesota

                                                 *Shamso M. K. v. Saul*
                                                 Case No. 19-cv-1531 (TNL)